## UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RAYMOND DECKELMAN**                    **CIVIL ACTION**

**versus**                                                    **NO. 13-6303**

**ROBERT C. TANNER, WARDEN**        **SECTION: "A" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Raymond Deckelman, is a state prisoner incarcerated at the B.B. "Sixty" Rayburn Correctional Center, Angie, Louisiana.   On July 28, 2010, he was convicted of manslaughter under Louisiana law.[1]  On September 20, 2010, he was found to be an habitual offender and was sentenced as such to a term of forty years imprisonment without benefit of

---

[1]  State Rec., Vol. I of III, trial transcript, p. 570; State Rec., Vol. I of VI, minute entry dated July 28, 2010; State Rec., Vol. I of VI, jury verdict form.

probation or suspension of sentence.[2]  On September 14, 2011, the Louisiana First Circuit Court of Appeal affirmed his conviction, habitual offender adjudication, and sentence.[3]  The Louisiana Supreme Court then denied his related writ application on April 9, 2012.[4]

On April 5, 2013, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on May 24, 2013.[6]  His related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on September 9, 2013,[7] and by the Louisiana Supreme Court on October 10, 2014.[8]

While his state post-conviction proceedings were still ongoing, petitioner filed the instant federal application seeking *habeas corpus* relief.[9]  The state concedes that the application is timely.[10]

---

[2] State Rec., Vol. III of VI, transcript of September 20, 2010; State Rec., Vol. I of VI, minute entry dated September 20, 2010.

[3] State v. Deckelman, No. 2011 KA 0296, 2011 WL 4436529 (La. App. 1st Cir. Sept. 14, 2011); State Rec., Vol. V of VI.

[4] State v. Deckelman, 85 So.3d 693 (La. 2012); State Rec., Vol. V of VI.

[5] State Rec., Vol. IV of VI.

[6] State Rec., Vol. IV of VI, Judgment on Post Conviction Relief with Reasons.

[7] State v. Deckelman, No. 2013 KW 1191 (La. App. 1st Cir. Sept. 9, 2013); State Rec., Vol. VI of VI.

[8] State v. Deckelman, 150 So.3d 891 (La. 2014).

[9] Rec. Docs. 1 and 3.

[10] Rec. Docs. 10 and 11.  At the time the state filed its response in this matter, petitioner's post-conviction writ application was still pending before the Louisiana Supreme Court.  Therefore, state argued that petitioner's state court remedies could not be considered exhausted until the Supreme Court issued its ruling.  Because that court has since denied the writ application, petitioner's claims are now exhausted and will therefore be addressed on the merits in this opinion.

### I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary

to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  <u>Bell</u>, 535

U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals

has explained:

> A state court decision is contrary to clearly established precedent if
> the state court applies a rule that contradicts the governing law set
> forth in the [United States] Supreme Court's cases.  A state-court
> decision will also be contrary to clearly established precedent if the
> state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme
> Court and nevertheless arrives at a result different from [United
> States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets,

and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court

has held:  "[A] state-court decision is an unreasonable application of our clearly established

precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the

facts of a particular prisoner's case."  <u>White v. Woodall</u>, 134 S. Ct. 1697, 1706 (2014).  However,

the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state
> court unreasonably applies this Court's precedent; it does not require
> state courts to extend that precedent or license federal courts to treat
> the failure to do so as error.  Thus, if a habeas court must extend a
> rationale before it can apply to the facts at hand, then by definition
> the rationale was not clearly established at the time of the state-court
> decision.  AEDPA's carefully constructed framework would be
> undermined if habeas courts introduced rules not clearly established
> under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant *habeas* relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

  While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
>   If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from

using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state

courts.").

   The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law

and apply the strictly deferential standards of review mandated therein.  White v. Woodall, 134 S.

Ct. 1697, 1701 (2014).

II.  Facts

   On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts

of this case as follows:

>   In 2009, Kenneth Beeson and his girlfriend, Christy Ferman,
> lived together in an apartment on City Drive, off of Old Spanish Trail
> in Slidell.  The defendant lived in a trailer across the street from
> Kenneth and Christy.   The defendant's girlfriend, Amy, had
> previously lived with him, but she had recently broken up with him
> and moved out of the trailer.  The defendant was allegedly angry with
> Kenneth because the defendant thought Amy was cheating on him
> with both Kenneth and Christy while he and Amy were still together.
> Christy insisted that nothing was going on with them and Amy.  Over
> the course of weeks, the defendant would yell at and taunt Kenneth
> when the defendant saw him.
>   On May 30, 2009, residents of the apartment complex met at
> the pool to celebrate Christy's birthday.  There was food and alcohol
> at the party.  Kenneth drank beer, and Christy drank wine.  Christy
> invited the defendant to the party. The defendant declined. When the
> party ended around 8:30 p.m., Christy went back to her apartment to
> get ready to go out.  Kenneth began gathering other girls to go out
> with Christy.  At some point while Kenneth was doing this, Kenneth
> walked across the street to the defendant's yard.

-  6  -

Chassidy Adkison, who lived in the same apartment complex as Kenneth and Christy, testified at trial that she was outside her apartment and observed what occurred. She stated the defendant was sitting in his yard, angry and screaming at Kenneth, while he was gathering up people to go out. Kenneth had "had enough" and walked across the street toward the defendant. The defendant and Kenneth walked toward each other in the defendant's yard and began arguing. No strikes were thrown. Christy came from her apartment and got in between Kenneth and the defendant. Christy turned toward Kenneth and directed him away from the defendant. Kenneth was walking backward, still arguing with his hands in the air. The defendant then came up behind Christy, grabbed Kenneth by the shoulder, and stabbed Kenneth in the middle of the chest. Chassidy did not see the weapon and was not sure if Kenneth was stabbed or shot. Kenneth took a step or two and fell backward on the ground. Chassidy stated that she saw everything and not once did she see Kenneth put his hands on the defendant.

Christy testified at trial to essentially the same facts as Chassidy. According to Christy, while she was getting ready to go out, she heard the defendant yelling from across the street. Shortly thereafter, she heard Kenneth's voice respond to the defendant. As Christy walked outside, she saw Kenneth walking across the street toward the defendant. The defendant was near the front of a small boat. As Christy approached them, she heard the defendant tell Kenneth that if he came in his yard, he was going to kill him. Kenneth approached the defendant and bumped him with his chest. Kenneth asked the defendant if he realized he weighed 100 pounds, that his "old lady" could "f—— him up," and that he needed to shut up and leave him (Kenneth) alone.[FN1] Kenneth did not put his hands on the defendant. Neither Kenneth nor the defendant had a weapon in his hand. Christy put her arm between the two men and told Kenneth that he could not be in the defendant's yard. Kenneth put up a hand and starting walking backward, while Christy was facing Kenneth with her arm on his chest. Christy testified that she did not see Kenneth get stabbed. She did not see or hear the defendant approach. She only remembered talking to Kenneth as they were walking and then hearing a very loud noise, followed by Kenneth falling to the ground on his back. Christy thought Kenneth had been shot. According to Christy, Kenneth did not put his arms around the defendant, grab him, or lay a hand on him.

[FN1] Kenneth was 5'10" and weighed 226 pounds. The defendant is smaller in stature.

Kenneth suffered a fatal stab wound to the middle chest. Dr. Michael DeFatta testified at trial that the wound was just less than an inch in length. The knife penetrated Kenneth's chest plate, or sternum, and went through the pericardial sac and perforated the aorta. Kenneth probably lived only seconds after being stabbed by the defendant. Dr. DeFatta explained that the loud sound witnesses may have heard when Kenneth was stabbed was the knife impacting the half-inch thick portion of bone over the chest. He opined it was also possible that air could have escaped from the right chest cavity.

The defendant stabbed Kenneth with a kitchen knife and fled the scene on foot. Several hours later, the police apprehended the defendant at his father's house, which was about one mile from the defendant's trailer. The defendant was taken to the Slidell Police Department, where he provided an audio statement. The defendant did not testify at trial. However, his statement was played for the jury. According to his statement, the defendant was working inside a small boat next to his trailer. He was cutting carpet with a kitchen knife. Kenneth walked from across the street and pulled the defendant out of the boat. Christy arrived and separated the two men. Kenneth backed up. Kenneth then grabbed the defendant a second time, and the defendant did not have a chance to get away. The defendant had the knife in his right hand. While facing each other, Kenneth squeezed the defendant by the arms under his ribcage. The defendant's right arm was trapped, so he switched the knife to his left hand and stabbed Kenneth in the chest. Kenneth fell face-forward on the sidewalk. The defendant panicked and ran, jumping fences, running through bushes, and finally sitting by a tree. He thought he brought the knife with him, but realized he dropped it when he was going over a fence. The defendant explained that he was a four-time convicted felon, so he was scared to turn himself in to the police. When the defendant was asked during the interview if he and Kenneth had any problems in the past to make him be in fear of Kenneth wanting to cause bodily harm to him, the defendant responded, "We've never had words."[11]

---

[11] State v. Deckelman, No. 2011 KA 0296, 2011 WL 4436529, at *1-2 (La. App. 1st Cir. Sept. 14, 2011); State Rec., Vol. V of VI.

### III.  Petitioner's Claims

Petitioner claims that he received ineffective assistance of counsel at trial.  The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced her defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of

his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."  Crockett, 796 F.2d at 793.

Because the state courts rejected petitioner's ineffective assistance of counsel claims on the merits, this Court must defer to the state court decisions unless they were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court recently explained that, under the AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference

and latitude that are not in operation when the case involves review
under the <u>Strickland</u> standard itself.

A state court's determination that a claim lacks merit
precludes federal habeas relief so long as fairminded jurists could
disagree on the correctness of the state court's decision. <u>Yarborough
v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938
(2004).  And as this Court has explained, "[E]valuating whether a
rule application was unreasonable requires considering the rule's
specificity.  The more general the rule, the more leeway courts have
in reaching outcomes in case-by-case determinations." <u>Ibid</u>.  "[I]t is
not an unreasonable application of clearly established Federal law for
a state court to decline to apply a specific legal rule that has not been
squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556
U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009)
(internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then

explained:

Surmounting <u>Strickland</u>'s high bar is never an easy task.  An
ineffective-assistance claim can function as a way to escape rules of
waiver and forfeiture and raise issues not presented at trial, and so the
<u>Strickland</u> standard must be applied with scrupulous care, lest
intrusive post-trial inquiry threaten the integrity of the very adversary
process the right to counsel is meant to serve.  Even under *de novo*
review, the standard for judging counsel's representation is a most
deferential one.  Unlike a later reviewing court, the attorney observed
the relevant proceedings, knew of materials outside the record, and
interacted with the client, with opposing counsel, and with the judge.
It is all too tempting to second-guess counsel's assistance after
conviction or adverse sentence.  The question is whether an attorney's
representation amounted to incompetence under prevailing
professional norms,  not whether it deviated from best practices or
most common custom.

Establishing that a state court's application of <u>Strickland</u> was
unreasonable under § 2254(d) is all the more difficult. *The standards
created by <u>Strickland</u> and § 2254(d) are both highly deferential, and
when the two apply in tandem, review is doubly so.*  The <u>Strickland</u>
standard is a general one, so the range of reasonable applications is
substantial.  Federal habeas courts must guard against the danger of
equating unreasonableness under <u>Strickland</u> with unreasonableness

> under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id</u>. at 105 (citations omitted; emphasis added).  For the following reasons, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

Petitioner first argues that his counsel was ineffective for "allowing inaccurate instructions to be given to the jury before deliberations."[12]  In denying this claim on direct appeal, the Louisiana First Circuit Court of Appeal held:

> In these related assignments of error, the defendant argues that the improper jury charges on self-defense violated fundamental requirements of due process.  Specifically, the defendant contends that the trial court's erroneous jury charge on retreat was based on law that was in effect prior to the date of the alleged offense.  Further, he argues that the trial court should have included in its jury instructions the 2006 change in the law on justifiable homicide as set out in La. R.S. 14:20(C) and (D).  In the alternative, the defendant asserts ineffective assistance of counsel for defense counsel's failure to object to the jury charge on retreat, as well as for his failure to request that the jury be properly charged with the law under La. R.S. 14:20(C) and (D) as it read at the time of the alleged offense.
>
> As the defendant has pointed out, defense counsel did not object to the proposed jury charges.  Normally, such failure to object would preclude consideration on appeal of arguments challenging the giving or failure to give a jury charge.  <u>See</u> La. Code Crim. P. arts. 801(C) & 841(A).  However, in order to address the claim of ineffective assistance of counsel, we will address the arguments concerning the jury charges.  <u>See</u> <u>State v. Cooper</u>, 2005-2070 (La. App. 1st Cir. 5/5/06), 935 So.2d 194, 199, <u>writ denied</u>, 2006-1314 (La. 11/22/06), 942 So.2d 554.

---

[12]  Rec. Doc. 3, p. 5.

A claim of ineffectiveness of counsel is analyzed under the two-pronged test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).  In order to establish that his trial attorney was ineffective, the defendant must first show that the attorney's performance was deficient, which requires a showing that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment.  Secondly, the defendant must prove that the deficient performance prejudiced the defense.  This element requires a showing that the errors were so serious that the defendant was deprived of a fair trial; the defendant must prove actual prejudice before relief will be granted.  It is not sufficient for defendant to show that the error had some conceivable effect on the outcome of the proceeding.  Rather, he must show that but for the counsel's unprofessional errors, there is a reasonable probability outcome of the trial would have been different.  State v. Serigny, 610 So.2d 857, 859-60 (La. App. 1st Cir. 1992), writ denied, 614 So.2d 1263 (La. 1993).  Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.  State v. Robinson, 471 So.2d 1035, 1038–39 (La. App. 1st Cir.), writ denied, 476 So.2d 350 (La. 1985).

Louisiana Code of Criminal Procedure article 807 provides:

> The state and the defendant shall have the right before argument to submit to the court special written charges for the jury.  Such charges may be received by the court in its discretion after argument has begun.  The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
>
> A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent.  It need not be given if it is included in the general charge or in another special charge to be given.

A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.  La R.S. 14:20(A)(1).  Louisiana Revised Statutes 14:20(A)(2) provides:

- 13 -

> When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention.  The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

The defendant argues defense counsel should have objected to the following jury charge:

> Some factors that you should consider in determining whether the defendant had a reasonable belief that the killing was necessary are:

> (1) The possibility of avoiding the necessity of taking human life by retreat[.]

The defendant further contends defense counsel failed to request that the jury be properly charged with La. R.S. 14:20(C) and 14:20(D), which had been the law for nearly three years before the killing took place.

Louisiana Revised Statutes 14:20(C) and 14:20(D) were added to the statute as part of a revision that deleted the language, "[T]he homicide shall be justifiable even though the person does not retreat from the encounter" from La. R.S. 14:20(A)(3) (justifiable homicide committed by a person in a dwelling, place of business, or motor vehicle during burglary or robbery); as well as deleting the language "[T]he homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter" from La. R.S. 14:20(A)(4)(a) (justifiable homicide committed by a person in a dwelling, place of business, or motor vehicle to prevent entry or to compel the intruder to leave); and adding La. R.S. 14:20(B), (C), and (D). See 2006 La. Acts No. 141, § 1.  See State v. Morris, 2009-0422 (La. App. 1st Cir. 9/11/09), 22 So.3d 1002, 1012-13.

Louisiana Revised Statutes 14:20(B), (C), and (D) provide:

> B. For the purposes of this Section, there shall be a presumption that a person lawfully inside a

dwelling, place of business, or motor vehicle held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the premises or motor vehicle, if both of the following occur:

(1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.

(2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.

C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.

D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.

See Morris, 22 So.3d at 1013.

We note that arguably the first prong of the Strickland analysis is met. As pointed out by the defendant, the change in the law on retreat, specifically the addition of paragraph (D), was not new. By the time of the defendant's trial, during which the jury charge conference was held, the change in the law had been in effect for about four years. We also do not see how the failure to object to the old law or request the new law, which appears to be more favorable to a defendant asserting self-defense, could have constituted trial strategy by defense counsel. Cf. State v. Albert, 96-1991 (La. App. 1st Cir. 6/20/97), 697 So.2d 1355, 1363-64.

In any event, it is unnecessary to determine if defense counsel performed deficiently. Even assuming deficient performance, we do

not find the defendant proved that such performance prejudiced the defense.  A conviction will not be overturned on the grounds of an erroneous jury charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial.  An erroneous instruction is subject to harmless error review or in the case of an ineffective assistance of counsel claim, an analysis of whether the defendant was prejudiced by the error.  The question becomes whether it appears beyond a reasonable doubt that the erroneous instruction did not contribute to the jury's finding of guilt or whether the error is unimportant in relation to everything else the jury considered, as revealed in the record.  Stated another way, the appropriate standard for determining harmless error is whether the guilty verdict was surely unattributable to the jury charge error.  See Cooper, 935 So.2d at 199200.

Assuming defense counsel erred in failing to object to the charge referencing retreat, considering the law and the evidence presented at trial, as well as the jury charge on self-defense as a whole, the verdict was surely unattributable to any such error.  While the possibility of retreat is no longer to be considered, many of the requisite elements to establish whether a homicide is justifiable remain.  For example, as we noted in Morris, 22 So.3d at 1013, paragraph (A) of the statute sets forth situations when a homicide may be justifiable depending on the reasonable belief of the person committing the homicide, the danger presented to that person or others, and the need for the use of deadly force.  Under La. R.S. 14:20(A)(1), for a homicide to be justifiable, it must be committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.  Paragraph (D), while prohibiting consideration of the possibility of retreat, tracks the language of La. R.S. 14:20(A)(2) in requiring the factfinder to determine whether or not the person who used deadly force, not involving unlawful entry, had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving danger to life or great bodily harm.  While La. R.S. 14:20(C) provides that there is "no duty to retreat before using deadly force," that statement is limited by the language "as provided for in this Section."  See Morris, 22 So.3d at 1013.  The three places afforded added protection under La. R.S. 14:20 are inside a dwelling, place of business, or motor vehicle.  See La. R.S. 14:20(A)(3), 14:20(A)(4)(a), 14:20(B).

- 16 -

The defendant was not in his dwelling, business, or motor vehicle when he stabbed and killed Kenneth. While it appeared he was in a place he had a right to be, to constitute justifiable homicide, the defendant, in killing Kenneth, must have had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving danger to life or great bodily harm. The version of events as described at trial by Chassidy and Christy indicated that the extent of physical contact between the defendant and Kenneth was a brief bumping of the chests and that, while Christy was backing Kenneth away from the altercation, the defendant approached Kenneth and stabbed him.

The defense version of events, as indicated by the defendant's statement played at trial, suggested that Kenneth grabbed the defendant and then released him when Christy intervened. Kenneth then grabbed the defendant again, who was "bear hugged," as described by Sergeant Fred Ohler, with the Slidell Police Department, who took the defendant's recorded statement. While Kenneth was holding the defendant, the defendant, with his free arm, stabbed Kenneth in the chest, killing him.

Under either version of events, we do not find Kenneth's actions in any way constituted a violent or forcible felony upon the person of the defendant. Moreover, any physical contact with the defendant by Kenneth, who at all times was unarmed, clearly did not involve danger to life or great bodily harm.

The defendant's conduct in stabbing Kenneth was disproportionate to any perceived threat. In State <u>ex rel.</u> D.P.B. 2002–1742 (5/20/03), 846 So.2d 753, 756, our supreme court quoted from State v. Plumlee, 177 La. 687, 699, 149 So. 425, 428-29 (1933), which discussed proportionate use of deadly force:

> Two things must concur in order to justify us in killing another to prevent him from committing some act; first, it must reasonably appear necessary in order to prevent him from committing a crime; and second, the crime to be prevented must be a great crime, and not a petty offense from which no great injury would result to us or others, in body or property. Therefore, if it reasonably appears that the crime can be prevented by any other available means, as by a warning, by a show of force, or by the use of any force short of killing, the killing would not be justified. And if the crime to be prevented was a petty

offense, not likely to result in great injury in body or property to us or others, we would not be justified in killing to prevent it, even if it could not be prevented by any other means.

Accordingly, the defendant's use of deadly force was neither reasonable nor apparently necessary.  See La. R.S. 14:20(D); State v. Johnson, 2006-1263 (La. App. 3d Cir. 2/7/07), 948 So.2d 1229, writs denied, 2007-0467 & 0509 (La. 10/12/07), 965 So.2d 398 & 399. Moreover, the defendant's actions after he left the scene of failing to report the stabbing and running to hide are inconsistent with a theory of self-defense.  See State v. Emanuel-Dunn, 2003-0550 (La. App. 1st Cir. 11/7/03), 868 So.2d 75, 80, writ denied, 2004-0339 (La. 6/25/04), 876 So.2d 829; State v. Wallace, 612 So.2d 183, 191 (La. App. 1st Cir. 1992), writ denied, 614 So.2d 1253 (La. 1993).  Flight following an offense reasonably raises the inference of a "guilty mind."  State v. Captville, 448 So.2d 676, 680 n.4 (La. 1984).

We find that the jury charge referencing retreat, even if erroneous, did not prejudice the defendant.  Moreover, on the evidence presented, the jury could not have reasonably believed the defendant acted in self-defense.

Accordingly, these assignments of error are without merit.[13]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[14]

The undersigned agrees with the state court's conclusion that, even if it is assumed that defense counsel performed deficiently in this respect, petitioner's claim still fails on the prejudice prong of the Strickland analysis.  As the United States Fifth Circuit Court of Appeals has explained:

---

[13]  State v. Deckelman, No. 2011 KA 0296, 2011 WL 4436529, at *1-2 (La. App. 1st Cir. Sept. 14, 2011); State Rec., Vol. V of VI.

[14]  State v. Deckelman, 85 So.3d 693 (La. 2012); State Rec., Vol. V of VI.

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error did not prejudice the defense.  In order to demonstrate prejudice under this second prong of the Strickland inquiry, [a petitioner] must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *A reasonable probability is a probability sufficient to undermine confidence in the outcome*".  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068 (emphasis added).

Gray v. Lynn, 6 F.3d 265, 269 (5th Cir. 1993) (quotation marks and citation omitted).

Therefore, the focus in the instant case is on whether there is reasonable probability that the jurors would have found that the killing of the victim was justifiable if they had been properly instructed that petitioner had no obligation to retreat.  As the state court explained, there is not.  Because petitioner was not in a dwelling, place of business, or motor vehicle, his killing of the victim would be justifiable under Louisiana law only if it fell within one of the two following circumstances:

> 1)     petitioner reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save himself from that danger, La. Rev. Stat. Ann. § 14:20(A)(1), or
>
> 2)     petitioner reasonably believed that victim was about to commit a violent or forcible felony involving danger to life or of great bodily harm and that it was necessary for him to kill victim in order to prevent that violent or forcible felony, La. Rev. Stat. Ann. § 14:20(A)(2).

As explained by the state court, the jury could not reasonably have found either of those circumstances to apply based on the evidence at trial.  If the prosecution was believed, petitioner

- 19 -

stabbed the unarmed victim as he was already backing away from a minor altercation involving the bumping of chests.  However, even if the defense was believed, petitioner, who admitted that he and the victim had never even "had words" in the past, stabbed the unarmed victim during a "bear hug."  Under neither scenario could the jury have appropriately concluded that petitioner "reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm" or reasonably believed that it was necessary for him to kill the victim in order to prevent the commission of "a violent or forcible felony involving danger to life or of great bodily harm."  Therefore, even if the jurors had been correctly instructed that petitioner had no duty to retreat, it would have been of no consequence because they did not need to reach that issue – the evidence simply would not support a finding of justifiable homicide regardless of whether or not petitioner had such a duty.   Accordingly, petitioner cannot establish the prejudice required to support his claim, because there is no reasonable probability that the result of the proceeding would have been different if only defense counsel had acted to ensure that the jury was correctly instructed on retreat as petitioner suggests.

Petitioner next asserted three additional ineffective assistance of counsel claims in the state post-conviction proceedings.  The state court district court denied those claims on the merits,[15] and petitioner's related writ applications were then denied without additional reasons

---

[15]  State Rec., Vol. IV of VI, Judgment on Post Conviction Relief with Reasons.

assigned by both the Louisiana First Circuit Court of Appeal[16] and the Louisiana Supreme Court.[17]

For the following reasons, petitioner likewise has not shown that the denial of those claims was

contrary to, or involved an unreasonable application of, clearly established federal law.

First, petitioner claims that his counsel was ineffective for failing to call Diane Steele

to testify at trial. With respect to such claims, the United States Fifth Circuit Court of Appeals has

explained:

> Claims that counsel failed to call witnesses are not favored on federal
> habeas review because the presentation of witnesses is generally a
> matter of trial strategy and speculation about what witnesses would
> have said on the stand is too uncertain. For this reason, we require
> petitioners making claims of ineffective assistance based on counsel's
> failure to call a witness to demonstrate prejudice by naming the
> witness, *demonstrating that the witness was available to testify and*
> *would have done so*, setting out the content of the witness's proposed
> testimony, and showing that the testimony would have been favorable
> to a particular defense. This requirement applies to both uncalled lay
> and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets

omitted; emphasis added); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o

prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner

must name the witness, *demonstrate that the witness was available to testify and would have done*

*so*, set out the content of the witness's proposed testimony, and show that the testimony would have

been favorable to a particular defense." (emphasis added)).

---

[16]   State v. Deckelman, No. 2013 KW 1191 (La. App. 1st Cir. Sept. 9, 2013); State Rec., Vol. VI
of VI.

[17]   State v. Deckelman, 150 So.3d 891 (La. 2014).

Although petitioner set out the content of Steele's proposed testimony,[18] he has not

provided the equally necessary evidence that Steele was in fact *available to testify at trial and would

have done so.*  The United States Fifth Circuit Court of Appeals has repeatedly held that a petitioner

cannot establish prejudice with respect to such a claim without such evidence.  See, e.g., Coleman

v. Thaler, 716 F.3d 895, 905 n.55 (5th Cir. 2013); Turner v. Epps, 412 Fed. App'x 696, 706 (5th Cir.

2011); Hooks v. Thaler, 394 Fed. App'x 79, 83 (5th Cir. 2010); Gray v. Epps, 616 F.3d 436, 443 (5th

---

[18]   In support of this claim, petitioner presented a signed police statement from Steele dated May 30, 2009, in which she stated:

> Kenneth and his wife walked across the street to Ramond's [sic] house.  Kenneth started cursing at Ramond [sic], saying apoligze [sic] to me.  Kenneth was pushing him with his chest several times while cursing and saying he would beat the piss out of him.  He went back and forth from the boat to the road pushing him.  Kenneth [sic] wife was trying to get him home and then Ramond [sic] looked like he touched his chest and then he went to the ground.  Then I say Ramond [sic] start running towards the fence.  He had no shirt on and dark colored shorts w/ stripes.

State Rec., Vol. IV of VI.  He additionally contends that there was an audiotaped statement in which Steele stated:

> 1)   Kenneth Beeson started the argument.
> 2)   Deckelman was "minding his own business" ...
> 3)   Beeson repeatedly threatened to beat the piss out of Deckelman.
> 4)   Beeson's was the only voice I heard, Deckelman never said a word.
> 5)   Beeson deliberately went over to antagonize Deckelman.
> 6)   Beeson went back over 5 or 6 times, even after his wife attempted to pull him back.
> 7)   Deckelman took as much as he could take.

Rec. Doc. 3, p. 8.

Cir. 2010); Day v. Quarterman, 566 F.3d 527, 538-39 (5th Cir. 2009).  The requirement that a

petitioner present evidence that a proposed witness was available to testify at trial and would have

done so is a prerequisite to the granting of relief, not "a matter of formalism."  Woodfox, 609 F.3d

at 808.  Therefore, this claim necessarily fails.

Petitioner similarly claims that his counsel was ineffective for failing to locate a

potential defense witness, Marie Maricich, and presenting her testimony at trial.  As a preliminary

matter, this Court notes that petitioner has presented no evidence that counsel was aware (or had any

reason to be aware) that Maricich might have had information beneficial to the defense.  Further,

even if defense counsel was aware of Maricich, petitioner has presented no evidence to establish that

she was not in fact contacted by the defense.  Finally, in any event, even if petitioner had made those

showings, he once again has failed to establish that he was prejudiced by counsel's failure to call

Maricich to testify.  As he did with Steele, petitioner has set out the content of Maricich's proposed

testimony;[19] however, once again, he has not provided any evidence that Maricich was in fact

---

[19]   In support of this claim, petitioner presented an affidavit from Maricich date February 6, 2012,
in which she stated:

> On May 30, 2009 I took my grandkids to Courtney Heights
> apartment complex to go swimming and on that day some of the
> tenants were having a barbeque.  Among those tenants were Kenneth
> and his girlfriend Switch.  I observed the tenants drinking
> alcohol which included Kenneth and Switch.  When the party started to get
> out of hand by being too verbal and loud I decided to take my
> grandkids home.  When I was there I didn't see Raymond at the
> apartment complex.
> On previous occasions I did hear Kenneth taunt Raymond
> calling him a crackhead.  Kenneth always seemed like he was bulling
> [sic] Raymond.

State Rec., Vol. IV of VI.

*available to testify at trial and would have done so.*  As already explained, without such evidence, his claim fails.

Lastly, petitioner claims that his counsel was ineffective for failing to request that Christy Ferman's video statement be presented at trial.  Specifically, he argues:

> [T]he video statement made by prosecution witness Ms. Christy Ferman, a key witness for the prosecution, should have been played at trial, in order that the jury might know the full scope of what Petitioner was facing on the night of the incident, and furthermore, since the parties were intoxicated, (Beeson had a BAC of .143-.145) that the jury would have been better able to determine if Ms. Ferman was in any condition, at the time of the incident, to remember details that she described at trial.[20]

Although it is unclear why defense counsel elected not to use the video, it is uncontested that he had in fact viewed it prior to trial.  In fact, he stated on the record: "Your Honor, this particular video was the one we had problems with when my disc didn't work, and I had to go over to your office and look at it.  The disc is not of the highest quality."[21]  Obviously, there could be various reasons why defense counsel might have decided not to play video.  For example, he may have felt it was not sufficiently useful in light of the poor quality of the recording, or he may simply have feared that it would have further highlighted Ferman's damaging testimony by unnecessarily putting it before the jury for a second time.  In any event, it is beyond cavil that counsel had viewed the statement, and therefore the general presumption is that his choice not to use it at trial was a strategic one.  And, as the United States Supreme Court has explained:

---

[20]  Rec. Doc. 3, p. 9.

[21]  State Rec., Vol. II of VI, transcript of July 27, 2010, p. 272.

> *Judicial scrutiny of counsel's performance must be highly deferential.*  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, *a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.*

<u>Strickland</u>, 466 U.S. at 689 (citation and quotation marks omitted; emphasis added).  Here, petitioner simply has not established that the state courts acted unreasonably in applying that presumption and refusing to second-guess trial counsel on this matter.

In summary, petitioner has not demonstrated that the state court decisions rejecting his ineffective assistance of counsel claims were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## <u>RECOMMENDATION</u>

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Raymond Deckelman be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from

a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415,

1430 (5th Cir. 1996) (en banc).[22]

New Orleans, Louisiana, this sixteenth day of June, 2015.


DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

---

[22] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.